# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | |
| | § | Case No. 22-50117 |
| Activa Resources, LLC and | § | Case No. 22-50118 |
| Tiva Resources, LLC, | § | |
| | § | Chapter 11 |
| Debtors. | § | |
| | § | (Joint Administration Requested) |
| | § | |

## DECLARATION OF JOHN HAYES IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, John Hayes, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      I am the President of Activa Resources, LLC ("**Activa**") and Tiva Resources, LLC ("**Tiva**" and together with Activa, the "**Debtors**").  On February 3, 2022 (the "**Petition Date**"), each of the above-captioned Debtors filed for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      I make this Declaration in support of certain initial motions (collectively, the "**First Day Motions**") filed in these cases (the "**Chapter 11 Cases**"), which have been or are to be soon filed, including the following:

(a) Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (filed in each case) ("**Joint Administration Motion**");

(b) Debtors' Emergency Motion for Entry of an Order (i) Authorizing the Debtors to File a Consolidated List of Creditors, (ii) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (iii) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "**Creditor List Motion**");

(c) Debtors' Emergency Motion to Extend Time to File Schedules and Statements ("**Extension Motion**");

(d) Debtors' Emergency Motion for Order (i) Authorizing Continued Use of Existing Business Forms and Records; (ii) Authorizing Maintenance of Existing Bank Accounts; and (iii) Waiving Certain U.S. Trustee Requirements ("**Cash Management Motion**");

(e) Debtors' Emergency Motion for an Order (i) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit Account as Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Adequate Assurance of Payment ("**Utilities Motion**");

(f) Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (i) Certain Prepetition Wages and Other Compensation, (ii) Certain Benefits and Confirming Right to Continue Benefits on Postpetition Basis, (iii) Reimbursement to Employees for Prepetition Expenses, (iv) Withholding and Payroll Related Taxes (v) Worker's Compensation Obligations, and (vi) Prepetition Claims Owing to Administrators and Third Party Providers ("**Employee Motion**");

(g) Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief ("**Cash Collateral Motion**");

(h) Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors (the "**Critical Vendors Motion**");

(i) Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay or Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases (the "**O&G Obligations Motion**"); and

(j) Debtors' Emergency Motion For Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of the Premium Finance Agreement and Pay Premiums Thereunder; (IV) Modify the Automatic Stay With Respect to the Workers' Compensation Program (the "**Insurance Motion**").

The Debtors may reference this declaration from time to time in support of other motions and

applications in these Chapter 11 Cases as well.

2

I.    THE DEBTORS' STRUCTURE AND BUSINESS AND THE REASONS FOR FILING CHAPTER 11

A.    **Debtors' Business and Properties**

3.    Activa is an independent oil and gas company headquartered in San Antonio, Texas.  Activa was initially formed in 2003.  It was converted to a limited partnership for a period beginning in 2005 and then was converted back to a limited liability company in 2007 with the merger and acquisition of New Tuleta Energy Partners, LLC.  At that time, Activa was owned solely by Activa Holding Corporation, which was, in turn owned by Activa Resources AG, a German company.  Then, in 2016, CIC Activa LP acquired a majority stake in Activa.  Tiva was later formed and capitalized in 2018 and is solely owned by CIC Activa LP.

4.    The Debtors owns a diversified portfolio of conventional oil and natural gas assets located in Texas, Arkansas and Louisiana that have solid production and reserve profiles.  The Debtors operate certain of their assets and own working interest in other assets.

5.    The Debtors' main asset is a working interest in the 16,400 acre OSR-Halliday Unit located in Leon and Madison Counties, Texas.  The first eight horizontal wells have been drilled in the unit and are on production, with additional wells scheduled to be drilled in the near-term. The OSR-Halliday Unit has the potential for over 30 million barrels remaining from primary production to full development.  Moreover, the OSR-Halliday Unit has additional potential for other horizons as well.  The Debtors' portfolio is rounded out by additional oil and gas producing assets known as the San Miguel Project, Halls Bayou, Pruitt Project, Pill Branch, and Adams Ranch.

B.    **Secured Indebtedness**

6.    On August 17, 2007, Activa, as borrower, entered into that certain Credit Agreement (as amended from time to time, the "**Credit Agreement**", and together with all

documents, agreements and instruments executed and delivered therewith and all related documents, agreements and instruments, collectively, the "**Loan Documents**") with Texas Capital Bank, N.A., as lender (the "**Lender**").  Approximately $10.2 million was due and outstanding under the Loan Documents as of the Petition Date (the "**Loan**").  The Lender asserts that the repayment of the Loan is secured by substantially all of the Debtors' assets.

7.      As of September 15, 2011, Activa entered into that certain ISDA Master Agreement (the "**Hedging Agreement**") with Cargill, Inc. ("**Cargill**").  As of December 27, 2011, Activa, Cargill, and the Lender entered into that certain Intercreditor Agreement (the "**Intercreditor Agreement**") to establish the relative priorities with respect to Activa's payment of its obligations under the Credit Agreement and the Hedging Agreement.  Under the Intercreditor Agreement, the Lender agreed to act as Collateral Agent (as that term is defined in the Intercreditor Agreement) for both Lender and Cargill

8.      Pursuant to the Twenty-First Amendment to the Credit Agreement, effective as of June 13, 2018, and other Loan Documents executed in connection therewith, Tiva agreed to guarantee the indebtedness owed by Activa under the Loan Documents.

**C.      <u>Events Leading to Chapter 11 Cases</u>**

9.      Record low oil and gas prices in 2020 during the pandemic created a challenging situation for the Debtors in 2021.  Production dropped and the Debtors' liquidity and ability to grow production was limited by the significantly reduced oil and gas prices. The low oil and gas prices, coupled with tightened credit standards and advance rates, also resulted in a significant reduction in the Debtors' Borrowing Base (as defined in the Credit Agreement) under the Credit Agreement with the Lender.

21799836.1
239272-10001

10.     As of March 31, 2021, the Debtors and the Lender entered into the Twenty-Fourth Amendment to the Credit Agreement (the "**Amendment**").  Under the Amendment, Activa was required to enter into hedges under the Hedging Agreement for the majority of its oil production at a time when the average price of oil was $50 per barrel.  At the same time, however, industry experts were forecasting that the price of oil per barrel would increase to $70 or more dollars per barrel in the next three to four months as the economy was recovering from the pandemic.  While Activa protested the Lender's requirement that it enter into the hedges, it was unable to persuade the Lender.  Accordingly, Activa entered into hedges with Cargill at prices ranging from $58 per barrel of oil in May 2021 to $54.35/$56.17 per barrel for August 2022.  In addition, under the Amendment, Activa was required to make monthly capital reduction payments of $150,000 in addition to payments of interest of approximately $50,000 per month.  The hedges with Cargill quickly went negative.  The hedge cost Activa more than $70,000 in June 2021 and more than $120,000 per month in both October 2021 and January 2022.

11.     The combination of the hedges, monthly capital reduction payments, and interest payments exceeded the net cash flow of the company.  In August 2021, management and Activa's Board of Directors determined that continuing to pay the $150,000 in monthly capital reduction, the increased payments required under the Hedging Agreement, and the interest payments would put Activa at risk of not being able to pay its normal course operating expenses.  This could have resulted in liens being placed on the Debtors' properties (and the Lender's Collateral).  While recognizing that their options were limited while the hedges with Cargill were in place, the Debtors offered and the Lender accepted the Debtors' offer to continue to pay pre-default interest while the Debtors worked on a plan to address the liquidity problems they faced.

21799836.1
239272-10001

12.     During the course of 2021, the Debtors paid monthly capital reduction payments estimated at $972,000, $647,000 in estimated hedge payments to Cargill and $511,00 in interest.  Activa continued to pay its vendors in the normal course of business on a 30-60-day schedule through December 2021.

13.     However, at the end of January 2022, the Lender swept Activa's operating accounts and put a hold on the joint interest account.  This action severely limited the Debtors' ability to continue the normal course of business.  At the same time, the Debtors' received joint interest billings from one of their operators that was more than $200,000 greater than budgeted.  Both of these events created a liquidity crisis for the Debtors that necessitated the filing of the Chapter 11 Cases to protect the Debtors' business as a going concern for the benefit of the Debtors' creditors and other stakeholders.

### D.     The Debtors' Intentions in Chapter 11

14.     The Debtors and their management continue to evaluate the companies' options in chapter 11, and reserve all their rights in this regard.  However, at this time, and in general, the Debtors intend to consummate a reorganization plan which would restructure and / or relieve all or part of the $10.2 million Loan asserted by the Lender, resolves the Debtors' obligations under the Hedging Agreement, and otherwise reorganizes the financial affairs of the companies.  The Debtors are further considering the sale of certain assets in bankruptcy to support the reorganization efforts.

## II.     FIRST DAY PLEADINGS

15.     In connection with the filing of their Chapter 11 Cases, the Debtors seek approval of the First Day Motions and related orders (the "**Proposed Orders**").  The Debtors respectfully

21799836.1
239272-10001

request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Chapter 11 Cases.

16.     I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

A.     **Joint Administration Motion**

17.     The Debtors' intended restructuring in these cases will involve claims and/or interests asserted against both Debtors.  Further, the management of the Debtors consists of the same individuals.  In light of these and other factors, I anticipate that each of the Debtors will seek similar or closely-related relief from this Court during the Chapter 11 Cases.  I also believe that most parties-in-interest will desire to receive information about the companies generally during these Chapter 11 Cases, rather than just the information concerning one of the Debtors.

18.     I am informed that joint administration of the Debtors' cases will greatly facilitate the filing of pleadings in these cases, helping the Debtors and other parties-in-interest to avoid unnecessary effort in filing duplicate (or nearly duplicate) pleadings in each case separately.  Instead, I understand that joint administration will permit a filing in just one of the cases to address issues in each of the Chapter 11 Cases.  Such a procedure would not only be more efficient, but will assist the Court and all parties-in-interest in achieving and maintaining a "global" view of matters involving the companies.  Especially because I understand that joint administration does

21799836.1
239272-10001

not affect the substantive rights of the Debtors, their estates or any other parties-in-interest, I can see only benefits – and likely great savings of judicial resources and Debtor and stakeholder time and money – realized from this relief.

**B.** **Creditor List Motion**

19.     As set forth in the Creditor List Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor, (b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) approving the form and manner of notice of commencement of these Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

20.     Although I understand the list of creditors is usually filed on a debtor-by-debtor basis, here, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and of little incremental benefit.  Finally, the Debtors respectfully submit that cause exists to authorize the Debtors to redact address information of individual creditors—several of whom are the Debtors' employees—from the Creditor Matrix because such information could be used to perpetrate identity theft.

21.     Additionally, through the Debtors' proposed noticing and balloting agent, the Debtors propose to serve the Notice of Commencement, on all parties entitled to notice of commencement of the Chapter 11 Cases to advise them of the meeting of creditors under section 341 of the Bankruptcy Code and of the bar date for filing proofs of claims.  Service of the single Notice of Commencement will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

21799836.1
239272-10001

C.    **Extension Motion**

22.    By the Extension Motion, Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by 14 days, for a total of 28 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown.

23.    The time leading up to the filing of the Chapter 11 Cases has been stressful for the Debtors' management and the operation of the business.  While I understand that providing complete information on the Debtors, as required by bankruptcy law and rules, is important, and the Debtors' management desires to provide such information, I am also certain that stabilizing the Debtors' business in the immediate post-filing period will help preserve and maximize value of these estates.

24.    For these reasons, I believe that the Court should grant the Debtors' Extension Motion.  With extra time to prepare the Schedules and Statements, the Debtors' management will not only have the best ability to assure the greatest possible accuracy and completeness of the information that is provided, but we will also have the additional "breathing room" to address any challenges to operations that the bankruptcy filings trigger.  Thus, additional time will help us to preserve value in the Debtors.

25.    Granting the Extension Motion will not, however, prejudice any creditors or other parties-in-interest.  I understand that the additional time that the Debtors are requesting to file Schedules and Statements is typical of such requests, as often granted by this Court.  In addition, I can assure the Court that the Debtors are prepared to respond to any appropriate information

requests that the Debtors may receive from any parties-in-interest in the meantime, should there be urgency to receive such information before it would become available in the Debtors' Schedules and Statements.

### D.     Cash Management Motion

26.     By the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors to utilize their cash management system to the extent described in the Motion, (ii) authorizing the Debtors to maintain the Bank Accounts (defined below) for a period of four weeks following the Petition Date; (iii) authorizing the Debtors to continue using their existing business forms and records; and (iv) granting the Debtors a waiver of certain bank account and related requirements of (a) the Office of the United States Trustee for the Western District of Texas (the "**U.S. Trustee**") set forth in the *Region 7 Guidelines for Debtors-in-Possession* (the "**Guidelines**"), and (b) section 345(b) of the Bankruptcy Code to the extent that such requirements are inconsistent with any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.

27.     In the ordinary course of their business, the Debtors utilize a cash management system (the "**Cash Management System**"), which allows the Debtors to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring and reporting.

### i.     Bank Accounts and Intercompany Transfers

28.     The Debtors currently maintain six (6) bank accounts (collectively, the "**Bank Accounts**") as follows:

| Account Holder | Bank | Account Number | Account Type |
|---|---|---|---|
| Activa | Susser Bank | XXX1931 | Checking account for operations |

| Activa | Susser Bank | XXXXXX0363 | Interest bearing money market account |
| Activa | Texas Capital | XXXXXX6581 | Checking account for operations |
| Activa | Texas Capital | XXXXXX2340 | Joint operating account for revenue production payments |
| Activa | Texas Capital | XXXXXX5854 | Interest bearing money market account |
| Tiva | Texas Capital | XXXXXX7393 | Checking account for operations |

29.     Activa's checking account for operations at Texas Capital Bank, N.A. ("**Texas Capital**") has historically been used to pay most of the Debtors' operating expenses, including payroll, utilities and expenses relating to the Debtors' operations.  Activa's joint operating account at Texas Capital has generally been used to segregate funds that Activa is holding for the benefit of others, including, for example, working interest owners in wells operated by Activa that need to be disbursed.  Activa's money market account at Texas Capital has historically held any excess funds beyond the Debtors' working capital needs.  Funds in the money market account are invested only in highly liquid assets with high credit ratings (equivalent to the United States Government or above) and have short-term maturity period of no more than 12 months.  Funds held in the money market account are generally available for daily settlement.

30.     Tiva's checking account at Texas Capital is available to funds Tiva's cash needs.

31.     The accounts at Texas Capital were utilized from the Debtors' inception.  However, as the Debtors began to make preparations for transitioning into Chapter 11 and were unable to remain current on the indebtedness owed to Texas Capital, they made the decision to open new

accounts at Susser Bank (with Texas Capital, the "**Debtors' Banks**").  Activa's operating account at Susser Bank has more recently been used to pay for the Debtors' ongoing general and administrative operating expenses.

32.     The Debtors intend to open new bank accounts at a U.S. Trustee approved depository (the "**New Accounts**") that will replicate their Cash Management System at Texas Capital.  However, the Debtors request permission to continue to use the Bank Accounts for a period of four weeks from the Petition Date to ensure a smooth transition of their Cash Management System with minimal disruption, to otherwise facilitate the payment of approved expenses pursuant to order of the Court on this and other initial "first day" motions, and to ensure that there is no distribution in the Debtors' ability to collect revenues that would otherwise be wired into the Bank Accounts.

### ii.     Business Forms

33.     As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "**Business Forms**") in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their profits and expenses. To minimize expenses to their estates and avoid confusion on the part of customers, vendors, and suppliers during the pendency of these Chapter 11 Cases, the Debtors request that the Court authorize their continued use of all correspondence and Business Forms (including, without limitation, letterhead, purchase orders, and invoices) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as required under the U.S. Trustee Guidelines.  Once the current business forms are exhausted, any

21799836.1
239272-10001

new Business Forms ordered by the Debtors will include the "Debtor-in-Possession" designation and the case number.

**E.**    **Utilities Motion**

34.    I understand that bankruptcy law provides utilities with certain protections during a chapter 11 case which are in addition to those rights of other creditors and service providers.  A failure to establish the parameters of these protections early in a bankruptcy case, I am told, can jeopardize the debtor's access to utility service.

35.    The Debtors purchase electricity, telephone, internet, and related services from vendors that I am told could be considered utilities for bankruptcy purposes.  It would be very problematic for the continued operation of the Debtors' business if any of these services were cut off.  For this reason, the Utilities Motion requests the Court to fix the terms of any protection afforded to the utility providers of the Debtors during the Chapter 11 Cases.  The intention of the Utilities Motion is to fulfill the Debtors' legal obligations to these utility providers while at the same time avoiding any unpredicted, abrupt interruptions of their services which could severely damage the Debtors' business.  The Debtors incur approximately $3,500 in costs to utility providers per month and are proposing allocating $2,000 into a designated sub-account for the adequate protection of the utility providers during the pendency of Chapter 11 Cases

36.    I believe it critical that the Debtors know from the very beginning of these cases the terms they must fulfill in order to assure that their telephone, internet, online and related services continue uninterrupted.  I have read the Utilities Motion and confirm that the facts set forth therein are true and accurate.

**F.**    **Employee Motion**

37.    By the Employee Motion, the Debtors seek entry of an order authorizing, but not

21799836.1
239272-10001

directing, the Debtors to (i) pay accrued prepetition wages, salaries, and other compensation to their Employees (as defined below); (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), Employee benefits plans and programs, as described below; (iii) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis, provided such reimbursement is below the statutory priority amount; (iv) pay all related prepetition payroll taxes and other deductions; (v) honor worker's compensation obligations and related obligations, if any; and (vi) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider.

### i    Debtors' Employees

38.    In connection with the operation of their business, the Debtors currently have six full-time employees (collectively, the "**Employees**").  None of the Employees are represented by a union or a collective bargaining unit.

39.    The Employees perform a wide variety of functions critical to the administration of these Chapter 11 Cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Employees include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Employees, the Debtors' restructuring efforts will be halted. If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere.  The loss of Employees at this

21799836.1
239272-10001

critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases.

40.     Moreover, most of the Debtors' Employees rely exclusively on their compensation and benefits from the Debtors to pay their daily living expenses and to support their families.  Thus, Employees will be exposed to significant financial hardships if the Debtors are not permitted to continue to pay, as applicable, their compensation, provide benefits, and maintain existing programs.  Consequently, the relief requested is necessary and appropriate.

### ii       Employee Compensation

41.     In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Employees.  These obligations are described in more detail below.

### (a)       Employee Compensation Obligations

42.     In the ordinary course of business, the Debtors pay their Employees on a semi-monthly basis, on the 5th and 20th of the month.  Payroll is drawn from the Debtors' operating account the day before it is disbursed.  The Debtors average payroll obligation per cycle is approximately $35,000.  The last payroll date before the Petition Date was January 31,2022, which covered the payroll period from January 16, 2022 through January 31, 2022.  The Debtors estimate that as of the Petition Date, approximately $5,000 has accrued and remains unpaid (the "**Employee Compensation Obligations**"), representing the prorated portion of the Employee compensation due for the period from February 1, 2022 through the Petition Date.  To the best of the Debtors' understanding, none of the Employees are owed more than $13,650 in accrued and unpaid general prepetition wages or salaries.  The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations.  In addition, the Debtors seek authority to cause any

21799836.1
239272-10001

prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### (b) Administrative Fee Obligations

43.    The Debtors use a third-party processor, ADP, to process their payroll.   The ongoing services of ADP are imperative to the smooth functioning of the Debtors' payroll system. While the Debtors do not believe that any outstanding obligations are owed to ADP as of the Petition Date, the Debtors seek authorization, but not direction, to pay any such fees to the extent it is determined that a balance is owed (the "**Administrative Fee Obligations**") and to continue paying the Administrative Fee Obligations postpetition in the ordinary course of business.   In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Administrative Fee Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### (c) Withholding Obligations

44.    For each applicable pay period, the Debtors may need to deduct certain amounts directly from Employees' paychecks, including, without limitation, pre- and after-tax deductions payable pursuant to policies and arrangements with certain Employees as well as legally-ordered deductions, and other miscellaneous deductions (collectively, the "**Deductions**").

45.    In connection with the compensation paid to Employees, the Debtors are required by law to withhold amounts related to federal, state, and local income taxes, as well as social security, unemployment and Medicare taxes (collectively, the "**Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities.  In addition, the Debtors are required to

21799836.1
239272-10001

make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**"). Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and remit, in conjunction with ADP, the same to the applicable taxing authorities.

46.     The Debtors seek authorization, but not direction, to continue to make the Deductions and to satisfy the Payroll Tax Obligations (collectively, the "**Withholding Obligations**" and with Employee Compensation Obligations and Administrative Fee Obligations, the "**Employee Obligations**") and to remit amounts withheld on behalf of third parties postpetition in the ordinary course of business.

### ii.    Employee Benefits

47.     In the ordinary course of business, the Debtors implement various benefits plans and policies for their Employees that can be divided into the following categories, all as are described in more detail below: (a) medical coverage (the "**Medical Plan**") and dental coverage (the "**Dental Plan**" and, with the Medical Plan, the "**Health Plans**"); (b) Debtor paid SEP-IRA (the "**IRA Plan**"); (c) workers compensation insurance (the "**Workers Compensation Program**"); and (d) paid and unpaid leave ("**Leave Policies**" and collectively with the Health Plans, IRA Plan and Workers Compensation Program, the "**Benefits Plans**"). All obligations with respect to the Benefits Plans are hereinafter referred to as the "**Benefits Obligations**."

21799836.1
239272-10001

(a)      **Health Plans**

48.      The Debtors believe that it is necessary and appropriate to continue to honor their obligations to Employees under the Health Plans. The Debtors request authority, but not direction, to pay all prepetition amounts due under the Health Plans. The Debtors also request authority, but not direction, to continue to offer the Health Plans and honor their obligations thereunder in the ordinary course of business during the administration of these Chapter 11 Cases.  Except as set forth below, as of the Petition Date, the Debtors believe they are current on all premium payments in connection with the Health Plans.

49.      Medical Plan.  The Debtors offer their Employees health insurance through a Blue Cross Blue Shield ("**BCBS**") high deductible plan.  The monthly premium to BCBS is $9,451.10. As of the Petition Date, the Debtors may owe the monthly advance payment to BCBS.  In addition, the Debtors also have a Medical Expense Reimbursement Plan ("**MERP**"), which allows Employees to recoup part of their deductible and to put their funds into a HSA or FSA plan.  Under the MERP, (i) Activa covers the first $500 for each person covered under the BCBS plan, (ii) Activa then pays 50% of additional medical costs up to the BCBS deductible ($6,900/individual and $15,000/family), and (iii) BCBS pays 100% of medical costs after the applicable Employee's deductible is met.  Activa pays $4,000 per month to Diversified Employee Benefit Services, LLC, the third-party administrator of the MERP to fund the MERP.

50.      Dental Plan.  The  Debtors offer their Employees dental insurance through a self-insured plan whereby the Debtors cover (i) 100% of the first $250 in dental expenses, (ii) 75% of the next $1,000 in dental expenses, and (iii) 50% of the next $2,000 in dental expenses.  The total annual maximum benefit per individual is $2,000.

21799836.1
239272-10001

**(b)**    **IRA Plan**

51.    The Debtors also maintain an IRA Plan whereby the Debtors provide a defined contribution of 10% of an Employee's salary into a SEP-IRA account.  The Debtors estimate that the IRA Plan costs approximately $72,000 annually.  There is an accrued balance of $188,807 owed to Employees under the IRA Plan as of December 31, 2021 from a period when the price of oil had decreased to approximately $20 per barrel.  The Debtors do not seek to pay such accrued amounts pursuant to this Motion, but instead to continue the IRA Plan in the ordinary course of business on a postpetition basis and consistent with past practice.

**(c)**    **Workers' Compensation Program**

52.    The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which the Debtors operate.  The Debtors maintain workers' compensation coverage ("**Workers' Compensation Insurance**") for claims ("**Workers' Compensation Claims**") through Texas Mutual Worker's Compensation Insurance. The Debtors pay approximately $1,230.00 a year to maintain the Workers' Compensation Insurance.  The Debtors seek authority, but not direction, to pay any premiums under the Workers' Compensation Insurance when they become due.

**(d)**    **Leave Policies**

53.    The Debtors maintain a paid leave benefit programs for Employees, providing paid leave for an annual vacation allotment and sick leave ("**Paid Leave**").  Paid Leave for the year accrues on January 1, but unused Paid Leave is not paid out upon termination of Employees and does not rollover each calendar year.  Employees accrue Paid Leave depending on their tenure. Similar to other programs described in this motion, Paid Leave is an integral benefit that the Debtors offer to the Employees, and will help maintain employee morale and protect employee

19

expectations.  Accordingly, the Debtors seek authority, but not direction, to pay their Employees any accrued Paid Leave in the ordinary course of business and consistent with past practice, and to continue paying Paid Leave to their Employees in the ordinary course of business on a postpetition basis and consistent with past practice.

54.     The Debtors also have a leave of absence policy (the **"Leave of Absence Policy"** and with Paid Leave, the "**Leave Policies**") in place for work absences related to family and medical leave ("**FMLA**").  Eligible Employees are entitled up to twelve workweeks of unpaid leave each year under the Leave of Absence Policy.  Employees taking a leave of absence maintain their benefits under the Health Plans and return to the same or equivalent jobs upon returning to work.  The Debtors seek authority, but not direction, to continue their Leave of Absence Policy in the ordinary course of business on a postpetition basis and consistent with past practice.

### iii.     Reimbursable Expense Obligations

55.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed certain Employees for reasonable and legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("**Reimbursable Expense Obligations**").  Reimbursable Expense Obligations typically include expenses for, among other things, travel, mileage, food, beverage, cell phone and certain other business and travel related expenses.  All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy, as described in more detail below.  In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate business expenses.

56.     The Debtors process expense and reimbursement claims on a rolling basis. As such, it is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations

21799836.1
239272-10001

outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtors for reimbursement. However, on or about the Petition Date, the Debtors estimate that they may owe approximately $2,000.00 in Reimbursable Expense Obligations to three Employees

57.     The Reimbursable Expense Obligations are ordinary course expenses that the Debtors' Employees incur in performing their job functions. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses.

58.     Employees incurred the Reimbursable Expense Obligations as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming Employees who incurred the Reimbursable Expense Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses, but only up to $13,650, less any other payments those Employees may receive as a result of the relief requested in this Motion. The Debtors also seek authority to continue their reimbursement policy, and to satisfy any prepetition amounts due in connection therewith, in the ordinary course of business during the administration of these Chapter 11 Cases.

59.     The Debtors' ability to successfully operate is contingent on reliable and loyal Employees.  As stated above, many of the Debtors' Employees are highly trained personnel that are familiar with the Debtors and their operations and would be difficult to replace.  Thus, it is essential to assure the Employees that the Debtors will honor the Employee Obligations and continue and maintain the Employee Benefits in the ordinary course of business throughout these

Chapter 11 Cases. A failure to promptly do so will create concern and discontent among the Employees and could lead to resignations. The loss of even a few key personnel, especially given that the Debtors only have six Employees, would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties. Accordingly, the Debtors respectfully request that the Court grant the Employee Motion.

### G.   Cash Collateral Motion

60.    As discussed above, the Debtors are obligated on a $10.2 million Loan to the Lender. The Lender has asserted valid, perfected secured claims, as I understand is those terms are defined in section 101 of the Bankruptcy Code, against the Debtors, which the Lender asserts are secured by first-priority valid and perfected liens[1] on, *inter alia*, all of Debtors' right, title, present and future interest in the Collateral, as that term is defined in the Loan Documents. The Lender asserts that its Collateral, together with the proceeds and revenues thereof, includes cash collateral as that term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

61.    Here, the Debtors intend to use the Cash Collateral, in accordance with the initial 13-week budget attached as Exhibit I (the "**Budget**") to the interim proposed order to (1) pay for working capital and general corporate purposes, (2) make essential payments to critical vendors and related to the Debtors' oil and natural gas assets, and (3) pay related transaction, costs, fees and expenses of the Chapter 11 Cases. The Debtors are committed to adhering to the Budget, subject to a permitted variance of 15%, unless the Lender otherwise agrees.

62.    Given the circumstances under which the Debtors have filed these cases, the Debtors have not yet been able to confer with the Lender regarding proposed adequate protection

---

[1] Subject only to any statutory liens for *ad valorem* taxes.

21799836.1
239272-10001

for the use of Cash Collateral.  However, the Debtors submit that, consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order field with the Cash Collateral Motion provides the Lender with more than sufficient provisions to protect it from any diminution in value of its valid, perfected, and unavoidable security interests in the Collateral during the pendency of these chapter 11 cases.  This includes:  (a) replacement liens in all of Debtors' currently owned or hereafter acquired property and assets to the extent of any decrease in value of the Collateral, including Cash Collateral, as a result of the Debtors' post-petition use of the Collateral and the imposition of the automatic stay; (b) adequate protection payments in the amount of $46,750 per month as provided in the Order; and (c) an allowed super-priority administrative claim, with priority in payment over any and all administrative expenses arising under Bankruptcy Code sections 503(b) and/or 507(a), to the extent that all other adequate protection provided by any order approving the use of Cash Collateral fails; provided however that the adequate protection is subject and subordinate to a carve out for payment of certain fees that I understand will be owed to the U.S. Trustee as well as fees owed to the Debtors' professionals, and does not include any liens on causes of action that I understand the Debtors may be able to bring under the Bankruptcy Code.

63.     The Debtors have a critical need to obtain and use cash in order to continue the operation of their business.  Without such funds, the Debtors will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on their business in a manner that will avoid irreparable harm to the Debtors' estates.  The ability of the Debtors to use cash collateral at this time is necessary to prevent immediate and irreparable harm and to preserve and maintain the going concern value of the Debtors' estates.   Accordingly, I respectfully submit on behalf of the Debtors that the Cash Collateral should be granted.

21799836.1
239272-10001

H.      **Critical Vendor Motion**

64.     In advance of filing the Chapter 11 Cases, the Debtors spent time reviewing and analyzing their books and records, to identify certain critical business relationships and/or suppliers of goods and services—the loss of which would materially impair the going-concern viability of the Debtors' business. In this process, the Debtors considered a variety of factors, including: whether a vendor is a sole- or limited-source for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

65.     As a result of this analysis the Debtors have identified counterparties, set forth on Exhibit C attached to the Critical Vendor Motion (the "**Critical Vendors**").

66.     At this time, the Debtors estimate that the Critical Vendors may hold claims in excess of approximately $125,000 that may not be entitled to administrative or other priority status

21799836.1
239272-10001

under section 503(b)(9) of the Bankruptcy Code, and $55,000 of which are due on an interim basis (the "**Critical Vendor Claims**").  By the Critical Vendor Motion, the Debtors seek authority to pay the Critical Vendor Claims.

67.     In return for paying the Critical Vendor Claims, the Debtors will use commercially reasonable efforts to require the applicable Critical Vendor to provide favorable trade terms in line with historical practice for the postpetition delivery of goods and services or otherwise continue supplying the Debtors with essential goods and services for the duration of these Chapter 11 Cases. The Debtors therefore request authority to condition payment upon such party's written agreement to continue supplying goods or services to the Debtors for the duration of these Chapter 11 Cases in accordance with trade terms at least as favorable to the Debtors as those practices and programs in place prior to the Petition Date (collectively, the "**Customary Trade Terms**").

68.     And, if any party accepts payment pursuant to the relief requested by the Critical Vendor Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then, subject to such party's right to object as set forth in the proposed Final Order attached as Exhibit B to the Critical Vendor Motion: (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Critical Vendor Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

21799836.1
239272-10001

69.     The Debtors submit that the requested relief will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise. Furthermore, to the extent that the Debtors determine that any additional parties qualify for Critical Vendor status, or that the Critical Vendor amounts set forth on **Exhibit C** must be supplemented or amended, the Debtors will supplement this pleading with the identities and amounts of claims held by any such parties pursuant to the terms of the Critical Vendor Motion.  Accordingly, the Debtors request that the Court grant the Critical Vendor Motion.

### I.     O&G Obligations Motion

70.     As described above, the Debtors own interests in certain oil and gas producing properties in Texas, Louisiana and Arkansas (collectively, the "**Leases**"). Pursuant to these Leases and related agreements, the Debtors are obligated to remit to the lessors (collectively, the "**Royalty Interest Owners**") their share of the proceeds from the sale of hydrocarbons from producing wells located on the properties subject to the Leases or other properties pooled or unitized together therewith on a monthly basis (collectively, the "**Royalties**").  A significant portion of the amount the Debtors owe in Royalties has been held in suspense by the Debtors for several years, because the amount owed to the Royalty Interest Owner is de minimus, because the Debtors no longer have the correct contact information for the Royalty Interest Owner, or because the Debtors do not otherwise have the requisite information necessary to make payment.  Accordingly, by the O&G Obligations Motion, the Debtors request authority to pay prepetition amounts due on account of Royalties owed on a current basis, in an amount totaling approximately $6,400, and to continue to make such payments during the course of these Chapter 11 Cases in the ordinary course of business.

21799836.1
239272-10001

71.     In addition, the Debtors have entered into certain assignments of the Leases, thereby granting an interest in a share of the production from the Debtors' producing wells that burdens the Debtors' Working Interests in the Leases (collectively, the "**Overriding Royalty Interests**"). The Debtors are obligated to remit to the owners of the Overriding Royalty Interests (collectively, the "**Overriding Royalty Interest Owners**") their share of the proceeds related to the sale of hydrocarbons attributable to the Overriding Royalty Interests on a monthly basis. The Debtors estimate that approximately $1,120 is owed on account of Overriding Royalty Interests for the prepetition period. By the O&G Obligations Motion, the Debtors request authority to pay all prepetition amounts due on account of Overriding Royalty Interests and to continue to make such payments during the course of these Chapter 11 Cases in the ordinary course of business.

72.     In addition to the Royalties and Overriding Royalty Interests, the Debtors are parties to certain JOAs, under which third parties own a Working Interest in wells operated by the Debtors (the "**Working Interest Owners**" and, together with the Royalty Interest Owners and the Overriding Royalty Interest Owners, the "**Interest Owners**"). Pursuant to the JOAs, the Working Interest Owners reimburse the Debtors for the Working Interest Owners' share of the expenditures of the wells through the payment of "joint-interest billings" ("**JIBs**"). The Debtors, in turn, pay the Working Interest Owners their proportionate share of the well's revenues from the sale of hyrdocarbons (the "**Working Interest Owner Payments**" and, together with the Royalties and Overriding Royalty Interests, the "**Royalty Payments**").[2] Like with payments owed to many of the Royalty Interest Owners, a significant portion of the amount the Debtors owe to Working

---

[2]     In the ordinary course of business, the Debtors and the other parties to the JOAs often agree to net expenses against revenues. Therefore, occasionally nettings occur in which the Debtors pay the Interest Owners for their share of revenues net of the Debtors' reimbursement for operating costs or, conversely, the Interest Owners reimburse the Debtors for their share of operating costs net of the revenues owed to them. In such cases, netting is beneficial to the JOA parties for administrative convenience.

21799836.1
239272-10001

Interest Owners has been held in suspense by the Debtors for several years in some instances, either because the amount owed to the Working Interest Owner is de minimus or because the Debtors no longer have the correct contact information for the Working Interest Owner. Accordingly, by the O&G Obligations Motion, the Debtors request authority to pay prepetition amounts due to Working Interest Owners on a current basis, in an amount totaling $10,300, and to continue to make such payments during the course of these Chapter 11 Cases in the ordinary course of business.

73.     In the ordinary course of business, the Debtors also incur severance taxes (the "Taxes") that must be remitted to the states of Texas, Louisiana and Arkansas for oil and gas production each month. Generally, purchasers of the Debtors' oil pay the Taxes and then deduct the corresponding amount from the amount they owe the Debtors on account of the purchased oil. The Debtors also pay certain severance taxes directly to the Texas Comptroller of Public Accounts, which average approximately $2,000 per month.[3]  By the O&G Obligations Motion, the Debtors are seeking authority to continue to pay (or deduct, as applicable) the Taxes.

74.     The Debtors also pay transportation, gathering, dehydration, compression, processing and service charges (the "**Gathering and Processing Charges**") in connection with the sale of their oil and gas production each month. Similar to the Taxes described above, the Gathering and Processing Charges incurred in the Debtors' oil production are paid by oil purchasers and then deducted from the amount of proceeds remitted to the Debtors. The Debtors estimate that approximately between approximately $5,600 in Gathering and Processing Charges is deducted from oil and natural gas production revenues on a monthly basis.  By the O&G

---

[3]     The amount of Taxes due varies greatly based on the applicable tax rates, the price of gas or oil, and the volume produced.

Obligations Motion, the Debtors are seeking authority to continue to deduct the Gathering and Processing Charges.

75.     Amounts owed on account of Royalty Payments, Taxes, and Gathering and Processing Charges (collectively, the "**Interest Owner Payments**") are calculated as the Debtors account for revenue from oil and natural gas extracted from the properties subject to the Leases. The Debtors typically receive payments for sales of its hydrocarbon products thirty (30) to sixty (60) days after production. Interest Owner Payments are generally remitted in the calendar month following receipt of payment from the purchasers. Accordingly, the Debtors still owe Interest Owner Payments for December and January production.  By the O&G Obligations Motion, the Debtors request authority to pay all prepetition Interest Owner Payments that are due and owing and to continue to make such payments in the ordinary course of business.

76.     In connection with the Debtors' daily operation of the Leases, the Debtors incur numerous obligations derived from both the Leases themselves and from other agreements governing leasehold operations (the "**Lease Maintenance Payments**"). The Lease Maintenance Payments are described more fully in the O&G Obligations.  In general, the Debtors do not believe that they currently owe any Lease Maintenance Payments, with the exception of a Surface Use Payment and State Regulatory Fee (both as defined in the O&G Obligations Motion).  Many of the amounts due for Lease Maintenance Payments, if any, will cover both prepetition and post-petition expenses. Given the sheer number of such agreements governing the Lease Maintenance Payments and the Debtors' limited staff, separating the prepetition portions from the post-petition portions of each individual invoice would be unduly burdensome.  Accordingly, by the O&G Obligations Motion, the Debtors are seeking authority to pay any outstanding Lease Maintenance

21799836.1
239272-10001

Payments and to continue to make such payments in the ordinary course of business post-Petition Date.

77.     The Debtors believe that payment of the Interest Owner Payments, the Lease Maintenance Payments and the ongoing JIBs (together, the "**Obligations**") is necessary to maintain the Debtors' rights under the Leases and to ensure that operations continue on an uninterrupted basis. If the Debtors are unable to pay the Obligations as they come due, the Debtors' operations could be severely impacted and production may cease, which would jeopardize the Debtors' efforts to successfully reorganize its affairs.

78.     The failure to pay the Obligations on a timely basis would also expose the Debtors and their properties to additional claims, liens and encumbrances to the detriment of all parties in interest. Failure to pay the Interest Owners could result in penalties and interest, turnover actions, conversion and constructive trust claims, litigation, and, in some instances, potential forfeiture and removal as operator. Similarly, the Debtors' failure to satisfy their Lease Maintenance Payments could have material adverse consequences for the Debtors, including the Debtors' removal as operator and the assertion of significant secured claims (statutory and/or contractual) against the property of the Debtors' estates.  Accordingly, the Debtors respectfully request that the Court grant the O&G Obligations Motion.

### J.     <u>Insurance Motion</u>

79.     By the Insurance Motion, the Debtors seek entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> to the Insurance Motion, authorizing, but not directing, the Debtors to: (a) continue existing insurance coverage entered into prepetition and satisfy payment obligations related thereto; (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business; (c) honor the terms of the Premium Finance Agreement (as

21799836.1
239272-10001

defined herein) and pay premiums thereunder; (d) modify the automatic stay with respect to the Debtors' workers' compensation program; and (e) grant related relief.

###### i.     The Insurance Policies

80.     In the ordinary course of business, the Debtors maintain eight insurance policies that are administered by seven third-party insurance carriers (collectively, the "**Insurance Carriers**"). These policies provide coverage for, among other things, the Debtors' general liability, automobile liability, worker's compensation, umbrella coverage, control of well, management liability, property, and key man (collectively, the "**Insurance Policies**"). The Debtors pay an aggregate amount of approximately $77,443.91 on account of annual premiums for the Insurance Policies. A schedule of the Insurance Policies is attached as <u>Exhibit B</u> to the Insurance Motion.[4]

81.     Certain of the Insurance Policies, including general liability, umbrella coverage, control of well and property policies are financed through a premium financing agreement with Bank Direct Capital Finance, a division of Texas Capital Bank, N.A., a copy of which is attached as **<u>Exhibit C</u>** (the "**Premium Finance Agreement**"). Pursuant to the Premium Finance Agreement, the Debtors are required to make ten monthly premium payments of approximately $3,152.19 beginning on September 1, 2021.  As of the Petition Date, there is approximately $12,608.76 outstanding on account of the Premium Finance Agreement, some or all of which will come due during the pendency of these Chapter 11 Cases.

82.     Continuation of the Insurance Policies and the Premium Finance Agreement and entry into new insurance policies is essential to the preservation of the value of the Debtors'

---

[4]   The Debtors request authority to honor obligations and renew all insurance policies, as applicable, regardless of whether the Debtors inadvertently fail to include a particular insurance policy on **<u>Exhibit B</u>** to the Insurance Motion.

21799836.1
239272-10001

businesses and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's (the "**U.S. Trustee**") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, to ensure uninterrupted coverage, the Debtors request authority to maintain their existing Insurance Policies, pay prepetition obligations related thereto, and enter into new insurance policies and premium financing agreements, as applicable, in the ordinary course of business.

### ii.  Worker's Compensation Program.

83.     The Debtors maintain a workers' compensation insurance policy for employees at the levels required by laws in the states in which the Debtors operate (collectively, the "**Workers' Compensation Program**").  As of the Petition Date, there are no known workers' compensation claims.  However, to the extent any of the employees assert claims under the Workers' Compensation Program, the Debtors request that the court modify the automatic stay under section 362 of the Bankruptcy Code to permit the employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

### iii.  The Debtors' Insurance Brokers.

84.     The Debtors obtain their Insurance Policies through two different insurance brokers, Upstream Brokers and Lockton Companies, LLC (together, the "**Insurance Brokers**"). The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods.  As of the Petition Date, the Debtors do not believe that they owe any amounts to the

Insurance Brokers on account of fees or any other prepetition obligations. Nevertheless, out of an abundance of caution, the Debtors seek authority to honor any amounts owed to the Insurance Brokers in the ordinary course of business on a postpetition basis to ensure uninterrupted coverage under the Insurance Policies.

Dated:  February 4, 2022

By: _/s/_ John Hayes _____
        John Hayes

21799836.1
239272-10001